MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: mmcgrath@mcrazlaw.com
       irothschild@mcrazlaw.com

By:   Michael McGrath, # 6019
      Isaac D. Rothschild, # 25726
      70066-2/mbt

Proposed Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>D&E DAIRY FARMS, LLC,<br><br>Debtor. | Chapter 11 Proceedings<br><br>No. 4:14-bk-16069 |
| In re:<br><br>DANIEL NOWLIN FARMS GENERAL PARTNERSHIP,<br><br>Debtor. | No. 4:14-bk-16072 |
| In re:<br><br>DANIEL NOWLIN AND ELAINE NOWLIN,<br><br>Debtors. | No. 4:14-bk-16073 |

**OMNIBUS DECLARATION OF DANIEL NOWLIN
IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY
MOTIONS**

1  Daniel Nowlin Farms, LLC ("**DNF**"), D&E Dairy Farms, LLC ("**D&E**"), and Daniel
2  Nowlin and Elaine Nowlin ("**Nowlin**") (collectively, the "**Debtors**"), submit this
3  Declaration of Daniel Nowlin in Support of Debtors' Chapter 11 Petition and First Day
4  Motions (the "**Declaration**").
5  I, Daniel Nowlin, declare, pursuant to 28 U.S.C. §1746, under penalty of perjury that:
6  My spouse, Elaine Nowlin, and I live in Casa Grande, Arizona. We have been in the
7  farming business since 1989 and the dairy business since 1995.
8  I am President of Daniel Nowlin Farms, LLC ("**DNF**"). I have 25 years of experience
9  in the farming business and I am responsible for the day-to-day management of DNF.
10  I am a general partner of D&E Dairy Farms, LLC ("**D&E**").  I have 19 years of
11  experience in the dairy business and I am responsible for the day-to-day management of
12  D&E.
13  I am familiar with the respective day-to-day operations, business, and financial
14  affairs of DNF and D&E..
15  On the date hereof (the "Petition Date"), the Debtors filed voluntarily petitions for
16  relief under the Bankruptcy Code. The Debtors intend to continue in possession of the
17  property and management of the businesses as debtors in possession. To enable the Debtors
18  to operate effectively and to minimize adverse effects from their chapter 11 filings, the
19  Debtors have filed the motions and applications described below.
20  In connection preparing for this case, I have reviewed each of the First Day Motions
21  referenced below.  The First Day Motions were prepared with my input and assistance, or
22  the input and assistance of employees working under my supervision.  To the best of my
23  knowledge, the information contained in the First Day Motions is accurate and correct.  As
24  set forth below, granting the relief requested in the First Day Motions is critical to the
25  Debtors' ability to preserve the value of their estates and succeed in their reorganization
26  efforts.

I submit this Declaration: (a) in support of the relief requested in the First Day Motions and (b) to explain to the Court and interested parties the facts and circumstances that have compelled the Debtors to seek relief under the Bankruptcy Code. Except as otherwise noted, all facts set forth in this Declaration are based upon my personal knowledge and the knowledge I have acquired from the Debtors' business records or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial conditions. With respect to the business records relied upon in my testimony, I am a custodian of records and am familiar with the Debtors' recordkeeping system.

## I. BACKGROUND

### A. Introductory Statement

1. The Debtors commenced these cases in order to (1) reduce the monthly payment to Farm Credit, (2) stabilize operations, (3) preserve jobs for the Debtors' approximately 63 employees, and (4) generate cash in an amount that, by current projections, will be sufficient to pay creditors more than they would receive in a liquidation. These cases were filed in response to significant financial challenges faces these Debtors and a deterioration of its relationship with its largest secured creditor, Farm Credit.

### B. History of Debtor DNF

2. DNF is an Arizona general partnership, of which my wife, Elaine Nowlin, and I are its general partners.

3. DNF owns the 318 acre farm in Willcox, Arizona and has a leasehold interest to farm another 2,300 acres of farm land (the "**DNF Property**").

4. DNF employs approximately 31 employees, including 22 full-time employees, and 9 on-call employees who are not presently working at DNF but are prepared to work as needed.

5. I am responsible for management of DNF.

6. Kelly Haddad is my brother-in-law and a bookkeeper for DNF.

7. I have been responsible for the day-to-day operations of the farm since 1989.

8. DNF ran a successful farm from 1989 to 2011.

9. In 2011, a milk crisis occurred. DNF relies heavily on dairies for the purchase of product and cash to plant crops resources. As a result of the dairy crisis DNF's resources became more and more strained.

10. Additionally, the last several years have placed greater strain on independently owned farms such as DNF.

11. All of these factors have placed great strain on DNF.

### C. History Of Debtor D&E

12. D&E is an Arizona limited liability company, of which my wife, Elaine Nowlin, and I are its members.

13. D&E owns and operates dairy farms in Casa Grande, Arizona and in Stanfield, Arizona (the "**D&E Property**"), and has approximately 2,000 head of dairy cows.

14. D&E employs 32 people, including 30 full-time employees, 1 part-time employee, and one contractor.

15. I am responsible for management of D&E.

16. Kelly Haddad is my brother-in-law and a bookkeeper for D&E.

17. I have been responsible for the day-to-day operations of D&E or its predecessor in interest since 1995.

18. D&E or its predecessor in interest ran a successful dairy farm from 1995 to 2011.

19. In 2011, a milk crisis occurred, D&E's resources became more and more strained.

20. Farm Credit extended credit to pay interest it was owned during the milk crisis and third parties.

21. Farm Credit swept accounts preventing D&E from paying real estate taxes, withholding taxes, forcing D&E to turn to hard-money lenders to cover payroll.

22. The debt level is now too large for D&E to manage.

23. Additionally, the last several years have placed greater strain on independently owned dairies.

24. All of these factors have placed great strain on D&E.

25. After numerous negotiations and Farm Credit acknowledging that their collateral is only worth approximately $9,000,000, Farm Credit still sweeps not less than $140,000 a month to service its debt.

### D. Debtors' History with Farm Credit and Events leadings to Chapter 11 Filing

26. Attached as Exhibit 1 to this Declaration is a Complaint filed in Pinal County, Arizona that covers in substantial more detail the ways in which Farm Credit has damaged the Debtors through their actions including paying third parties with the Debtors' loan proceeds, failing to disclose conflicts of interest, misleading third parties to guaranty debt, abusing its control over the Debtors' revenue to prefer certain creditors and pay itself.

27. The Debtors have a banking relationship with Farm Credit that began in the early 2000's, which at the time involved a credit line of not more than $1,500,000.

28. In 2009, dairy farms nationwide experienced a crisis as milk prices dramatically dropped to below 25% the price needed for operations to break even per Centum weight ("CWT").

29. Milk prices gradually improved but it was not until 2013 that prices increased to the level necessary for a dairy to break even per CWT.

30. Farm Credit took an aggressive approach to keep their loan file in good standing as it related to the Debtors' accounts.

31. The proceeds of milk sales to the United Dairymen of Arizona, which make up the vast majority of the Debtors' income, are directed to a lock-box account controlled by Farm Credit. With the milk income going directly to Farm Credit, Farm Credit arbitrarily determined when and how much of the proceeds would go to the Debtors for operations.

32. With the vast majority of the Debtors' income directed to Farm Credit, Farm Credit exercised substantial control over the Debtors.

33. Farm Credit would force the Debtors to short the funding of operations in order to service Farm Credit's loans - some of which were in the name of the Debtors, some of which were loans made to other related and unrelated borrowers.

34. Farm Credit prepared and created all financial statements for the Debtors, including personal financial statements for me and my wife, Elaine Nowlin, and used these financial statements to determine when and to whom loans would be made.

35. Farm Credit determined when to liquidate assets including the liquidation of 7 Circles Ranch, a ranch leased by DNF and owned by my mother, Linda Johnson.

36. Farm Credit also forced an entity owned by me; Linda Johnson; my brother, Dennis Nowlin; and John White, known as Keltic Pride Dairy Farm, to liquidate its dairy cows at a forced sale price prior to the end of fiscal year 2013, even though Keltic Pride had a higher price if the sale occurred in January of 2014.

37. Farm Credit routinely threatened to default the "whole complex" of loans if payments of interest or principal were not made in time to avoid review of the loan by regulators charged with review of Farm Credit's loan portfolio.

38. Farm Credit used funds from the Debtors' farm and dairy operations, interchangeably directing money and proceeds of loans from either to pay down the loans or to pay the operational costs of the other or third parties.

39. Farm Credit failed to disclose conflicts of interest to the Debtors.

40. Farm Credit engaged in self-dealing with the Debtors' assets.

41. Farm Credit's movement of funds among different borrowers and their accounts resulted in substantial disruption of business operations, using funds which should have been directed to payroll withholding and other taxes to make interest payments. The Debtors' loan balances expanded from approximately $11,100,000 in 2011 to the Farm Credit asserted amount of roughly $19,000,000 in 2014.

42. Farm Credit controlled the Debtors for Farm Credit's benefit by expanding lines of credit so as to keep payments current, require guaranties from additional individuals under false premises, making loans to relatives and friends of the principals without appropriate disclosure or underwriting, and unilaterally making payments from existing lines of credit. Farm Credit determined which collateral would be sold and when, and sweep the proceeds or the Debtors' operations to service and/or payoff credits without notice to Borrowers or Guarantors.

43. Farm Credit has refused to allow the Debtors discretion to manage their income and operations.

44. As milk prices continued to rise and the Debtors' production remained consistent, Farm Credit decided to take more money for servicing its loans than it had in the recent past. Additionally, the funds would be taken earlier in the month, and the Debtors were provided funds only upon the production of a receipt. In many instances, the Debtors never received the funds, but money was transferred to a payee directly from Farm Credit.

45. In many instances the payee was a borrower-customer of Farm Credit.

46. At Farm Credit's discretion, certain invoices would not be paid at all or Farm Credit would pay only a portion of the invoice. However, Farm Credit would determine what it believed to be an appropriate payment to itself.

47. In recent months, Farm Credit applied $140,000 a month to pay itself on its outstanding under-secured loans.

48. Also attached to this Declaration as Exhibit 2 is a letter I received as a member of Farm Credit, wherein Farm Credit alerts all members of an increase in delinquent loans and "certain internal controls and procedures related to credit origination and administration may not have been performed as they should have."

**II.     THE DEBTORS' FUTURE**

49. The Debtors intend to file a plan of reorganization within the exclusive period which will pay all of the Debtors' creditors substantially more than they would receive in a liquidation.

50. This creation of liquidity by reducing the monthly payment to Farm Credit will allow for the Debtors the operating capital necessary run the dairies and farms optimally.

51. Additionally, it will provide the necessary cash flow to allow the Debtors to have a manageable payment plan to all of its creditors.

52. The Debtors have substantial support from other farmers and dairymen in Casa Grande, Arizona and Willcox, Arizona that will allow them to continue to operate the dairies and farms successfully during the pendency of the bankruptcy and as reorganized debtors.

**III.    SUMMARY OF FIRST DAY MOTIONS**

    **A.    Expedited Motion For Joint Administration Of Estates And Transfer Of Cases To One Judge**

53. The entities are operating entities and the functions of those are interrelated with creditors typically dealing with them as one entity.

54. Joint administration of these cases will not result in any prejudice to the Debtors' creditors or other parties-in-interest. In fact, joint administration of these cases

would facilitate the administrative process and would ease the burden and expense of administering the estates.

### B. Emergency Motion Authorizing Payment Of Pre-Petition Wages, Salaries, And Employee Benefits

55. The Debtors collectively employ 63 employees as of the Petition Date (the "Employees").

56. A list of the Debtors' employees, identification as to which Debtor each employee works for, and their approximate bi-monthly wages are attached as Exhibit A to the Motion Authorizing Payment of Pre-Petition Wages, Salaries and Employee Benefits.

57. The Employees perform a variety of critical functions, including the operation of the Debtors' businesses. The Employees' skills, knowledge, and understanding of the Debtors' businesses are among the Debtors' most valuable assets. If pre-petition compensation and benefit amounts are not received by the Employees in the ordinary course, they will suffer personal hardship and unnecessary distraction from their duties. Such a result would destroy Employee morale and may result in unmanageable Employee turnover, causing immediate and pervasive damage to the Debtors' ongoing business operations. Any significant deterioration in morale at this time will substantially and adversely affect the Debtors and their ability to function, resulting in immediate and irreparable harm to the Debtors and their estates.

58. The Debtors' accrued pre-petition obligations owing to each individual Employee will be substantially less $12,475.

59. Collectively for all 63 employees, the accrued pre-petition obligations owing to employees for the current pay period are estimated to be approximately $43,355.07.

60. The Debtors will continue to employ all employees receiving payment of pre-petition wages in the ordinary course of the Debtors' businesses.

61. The relief requested will reduce significantly the administrative burden that might otherwise be imposed in this case. The compensation, benefit and reimbursement amounts that the Debtors seeks to pay to the Employees constitute priority claims under Bankruptcy Code §§ 507(a)(4) and (5). Requiring the Debtors to identify to what extent each of its Employees hold priority or general unsecured claims for employee benefits, and to modify benefit policies to enforce these distinctions, would impose substantial additional burdens of administration and expense that would unduly hamper the Debtors' operations and are, therefore, unwarranted under the circumstances.

62. To minimize the personal hardship Employees will suffer if pre-petition employee-related obligations are not paid when due, and to maintain morale of Employees during this critical time, the Debtors seek entry of an order authorizing the Debtor: (a) to pay and honor certain pre-petition claims that are outstanding as of the Petition Date for, among other things, (i) wages, salaries, and other compensation (including honoring or replacing any uncashed checks), (ii) state and federal withholding taxes and other amounts withheld or deducted, (iii) reasonable and customary business expenses that are reimbursable by the Debtors under company policy (collectively, the "Employee Obligations"); and (b) to pay and honor certain pre-petition claims related to employee benefits that the Debtors have historically paid in the ordinary course of business (collectively, the "Employee Benefits"). Additionally, the Debtors seek an order authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payments related to the foregoing Employee Obligations and Employee Benefits.

63. Debtors' Employee Obligations and Employee Benefits include salaries and wages, payroll taxes, payroll deductions and withholdings, health insurance premiums and contributions, and reimbursements for certain expenses. The Debtors customarily either

paid or withheld all of these Employee Obligations and Employee Benefits in the ordinary course of business.

64. The Employees are paid twice each month – once on the 5th day of each month for the period running from the 16th day through the end of the preceding month, and on the 20th of each month for the period running from the 1st through the 15th of the current month. The Debtors' last full pay period commenced Wednesday, October 1, 2014 and ended on Wednesday, October 15, 2014. In the ordinary course of business, wages that accrued during this pay period were paid on Monday, October 20, 2014. In addition, the Debtors owe wages and salaries for the pay period commencing on October 16, 2014 through the Petition Date that would ordinarily be paid on Wednesday, November 5, 2014.

65. The Debtors are required by law to withhold from each Employee's paycheck certain amounts related to federal, state, and local income taxes as well as social security and Medicare taxes (collectively, the "Withholding Taxes") for remittance to the appropriate taxing authorities. The Debtors must also match from their own funds social security and Medicare taxes withheld, and pay (based on a percentage of gross payroll) additional amounts for state and federal unemployment insurance

66. The Debtors provide approximately seven of their Employees with health insurance benefits.

67. The Debtors provide two employees with a housing allowances ($1,100 and $350 per month) and another two employees with vehicle reimbursements ($2,000 and $890.00 per month) each month for vehicles used in the Debtors' businesses.

68. The Debtors maintain workers' compensation insurance for each of their eligible employees.

69. The Debtors offer employees certain benefits including vacation time, sick time, and paid time off that employees accrue based on time worked. The Debtor seeks authority to continue to honor these employee benefits in the ordinary course of business.

### C. Debtors' Emergency Motions For Determination of Adequate Protection and to Appoint a Disbursing Agent

70. The Debtors require the use of all cash generated from its operations to continue operation of their businesses, including the protection, management, and maintenance of estate assets.

71. The Debtors' businesses generate cash proceeds through the sale of milk produced on the dairy farms and crops harvested.

72. While Farm Credit was in control of the Debtors' assets, funds from the dairy operations and the farm operations were used interchangeably and the Debtors have been unable to keep track of debts owed between them. Post-Petition, the consistent income from dairy operations and the seasonal income from the farming operations will be needed to support both operations. The Debtors have bolstered the services of this controller with the retention of Keegan, Linscott & Kenon, CPA's to keep track of the debts owed between D&E Dairy Farms and Daniel Nowlin Farms Partnership.

73. All proceeds from the sale of milk are currently deposited with Farm Credit in a lock-box arrangement. Farm Credit then determines the funds that it will off-set and then makes or directs the payment of operating expenses.

74. In recent months, Farm Credit has taken payments of not less than $140,000 per month to pay its pre-petition under-secured debt, thereby leaving insufficient funds for payment of payroll, withholding tax, ad valorem taxes on land and personal property and for payment of operating expenses.

75. Farm Credit is not protected by an equity cushion. However, the Debtors will provide a replacement lien on the Debtors' collateral including: the Debtors' real estate, current liquid assets in which Farm Credit has a perfected security interest in, the Debtors' livestock, Debtors' equipment, and the Debtors' crops that are currently in the ground

(collectively the "Collateral"). Farm Credit will receive a replacement lien of the same priority validity and perfected status as existed pre-petition.

76. Based upon my experience, the value of the farming and dairy operations will remain constant or increase post-petition as the demand for milk and crops are projected to remain as historically high levels post-petition. While pricing varies weekly, the value of the farms and dairies, their crops and milk should remain relatively constant or increase in the mediate future, within the range of market fluxations as judged over the long term.

77. On May 14, 2014, Farm Credit proposed a reduction of the interest rate on its loans with the Debtors to 3.0%, and then failed to implement such a rate.

78. The current value of the Debtors' pre-petition property collateralizing the approximately $19,000,000 claim of Farm Credit is:

    a. The dairy farms in Stanfield and Casa Grande, Arizona are valued at $4,000,000 as of the Petition Date, the values have been corroborated by appraisals conducted in-house by Farm Credit within the last 60 days;

    b. Daniel Nowlin Farms owns 318 acres of farmland in Willcox, Arizona collateralizing a Farm Credit lien of $700,000 as of the Petition Date.

    c. The Debtors own approximately $350,000 of equipment used in the dairy operations.

    d. The Debtors own approximately $200,000 of equipment used in the farming operations.

    e. The proceeds of pre-petition milk produced by the Debtors' cows, estimated to be $350,000 for the previous two weeks. Farm Credit will continue to have a lien on the first $350,000 of the Debtors' cash.

    f. The Debtors currently have only alfalfa planted in the ground. This crop is valued at $300,000.

g. The Debtors own approximately 1,850 dairy cows valued at $2,775,000 or $1,500 a head.

79. The Debtors must utilize all cash generated from operations to continue to conduct ordinary business operations. By continuing to operate their businesses, the Debtors will preserve and enhance the value of the Debtors' assets and can propose a successful reorganization. The Debtors' budget, which is attached as Exhibit A to the Debtors' Emergency Motion to Determine Adequate Protection and Appoint Disbursing Agent, sets forth the anticipated monthly revenue and anticipated ordinary and necessary expenses to maintain the business operations of the Debtors. This includes the cost of inventory, labor, payroll, and sales taxes, management, insurance, utilities, and supplies.

80. The Debtors have created this budget with the help of Keegan, Linscott & Kenon.

81. The Debtors have a past-due insurance payment due as of the Petition Date.

82. The Debtors do not have any past-due payments for utilities due as of the Petition Date.

83. It is currently planting season for oats. The budget for the farms reflects an increased expense for labor, seed, fertilizer and other planting expenses that will be incurred post-petition. The Debtors will need to use the proceeds of the dairy to pay for these expenses.

84. The Debtors under the supervision and with the permission of the Disbursing Agent will track the farming expenses paid by the dairies. These expenses will be paid or reconciled when the crops are harvested and sold or delivered to the dairies for feed. All of these transactions will be reflected on the monthly operating reports of the Debtors.

85. Milk proceeds created by those cows, also requires the Debtors' labor, feed costs, and transportation costs. It is not the Debtors that sell the milk, but UDA. UDA

Case 4:14-bk-16069-BMW   Doc 4   Filed 10/24/14   Entered 10/24/14 14:56:54   Desc
Main Document    Page 14 of 16

analyzes the milk for quality control issues and then market and sells the milk to create proceeds.

### D. Application to Employ and Retain Mesch, Clark & Rothschild, P.C.

86. The Debtors have also filed a motion to retain Mesch, Clark & Rothschild, P.C. ("**MCR**") as bankruptcy counsel with regard to the filing and administration of these cases. MCR was retained by the Debtors to represent them as counsel in connection with any bankruptcy proceedings. The Debtors desire to employ MCR in order to serve as counsel during the pendency of these cases. MCR regularly represents both debtors and creditors in bankruptcy matters, including Chapter 11 proceedings in the United States Bankruptcy Court for the District of Arizona. Accordingly, I believe MCR is well qualified to represent the Debtors as counsel in these cases.

### E. Application to Employ and Retain Keegan, Linscott & Kenon, P.C. ("KLK")

87. The Debtors have also filed an application to employ and retain KLK as financial advisors to the Debtors. In early 2014, the Debtors employed KLK as their financial advisor as the Debtors pursued strategic and restructuring options. KLK has been previously retained by the Debtors as accountants providing financial advice. However, they had to stop working because of lack of funds. The Debtors have been able to pay for the services of KLK for the last month. The Debtors desire to employ KLK in order to continue providing such restructuring advice as is necessary and requested by the Debtors, including, without limitation, bankruptcy and debt restructuring. KLK has become familiar with the Debtors' operations and business due to the restructuring services it provided to the Debtors prepetition. KLK regularly provides restructuring services to reorganizing debtors and other clients. Accordingly, I believe KLK is well-qualified to provide restructuring services to the Debtors in these matters.

## IV. CONCLUSION

In furtherance of its reorganization efforts, the Debtors respectfully request that orders granting the relief requested in the First Day Motions be entered.

DATED: October 24, 2014

                                          s/Daniel Nowlin
                                          DANIEL NOWLIN

COPY emailed October 24, 2014 to:

OFFICE OF THE U.S. TRUSTEE
230 N. First Avenue, Suite 204
Phoenix, AZ 85003
ustpregion14.px.ecf@usdoj.gov

  s/Grelda Castro
21L9169