MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone:   (520) 624-8886
Fax:     (520) 798-1037
Email: ecfbk@mcrazlaw.com
       mmcgrath@mcrazlaw.com
       irothschild@mcrazlaw.com

By:    Michael McGrath, # 6019
       Isaac D. Rothschild, # 25726
       70066-2/idr

Proposed Attorneys for Debtors

UNITED STATES BANKRUTPCY COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 Proceeding |
| D&E DAIRY FARMS, LLC, | Case No.  4: 14-bk-16069 |
| Debtor. | |
| In re | Case No.  4: 14-bk-16072 |
| DANIEL NOWLIN FARMS GENERAL PARTNERSHIP, | |
| Debtor. | |
| In re | Case No.  4: 14-bk-16073 |
| DANIEL NOWLIN AND ELAINE NOWLIN, husband and wife, | |
| Debtors. | |

## DEBTORS' EMERGENCY MOTION TO DETERMINE ADEQUATE PROTECTION AND APPOINT DISBURSING AGENT

The Debtors in possession, D&E Dairy Farms ("D&E") and Daniel Nowlin Farms ("DNF"), and their principals, Daniel and Elaine Nowlin ("Nowlin") (collectively the "Debtors") hereby move this Court to 11 U.S.C. §§105, 361, 363, and 552 and Rule 4001,

Fed. R. Bankr. P., to determine an appropriate form of adequate protection and authorize the Debtors' use of operating capital, including cash collateral, needed to permit the Debtors to operate and reorganize. This Motion is supported by the accompanying Memorandum of Points and Authorities and the Declaration of Daniel Nowlin, Declaration of Chris Linscott of Keegan, Linscott, & Kenon, and Fred Boice filed simultaneously herewith.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   JURISDICITON AND VENUE

1.   The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the District of Arizona on October 24, 2014 (the "Petition Date"). The Debtors operate their businesses and as individuals as debtors-in-possession pursuant to 11 U.S.C. §§1107 and 1108. This Court has jurisdiction to consider these Motions pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b). Venue of this proceeding is proper pursuant to 28 U.S.C. §§1408 and 1409.

### II.   INTRODUCTION OF THE DEBTORS

2.   Daniel and Elaine Nowlin husband and wife live in Casa Grande, Arizona. They have been in the farming business since 1989 and the dairy business since 1995.

3.   D&E owns and operates dairy farms in Casa Grande, Arizona and in Stanfield, Arizona, and has approximately 1,850 dairy cows. D&E employs 32 people, including 30 full-time employees, 1 part-time employee, and one contractor.

4.   DNF owns a 318 acre farm in Willcox, Arizona and leases five farms in Pinal County to farm another 2,300 acres of farm land. DNF employs approximately 31 employees, including 22 full-time employees, and 9 on-call employees who are not presently working at DNF but are prepared to work as needed.

### III.   THE DEBTORS' RELATIONSHIP WITH FARM CREDIT

5.   The Debtors have a banking relationship with Farm Credit that began in the early 2000's, which at the time involved a credit line of not more than $1,500,000.

2

6. In 2011, dairy farms nationwide experienced a crisis as milk prices dramatically dropped to below 25% the price needed for operations to break even per Centum weight ("CWT").

7. Milk prices gradually improved but it was not until 2013 that prices increased to the level necessary for a dairy to break even per CWT.

8. At this time Farm Credit took an aggressive approach to keep their loan file in good standing as it related to the Debtors' accounts. Instead of having the loans determined to be a distressed and make it eligible for a statutorily required restructuring of the debt (*see* 12 U.S.C. §2200 *et seq.*), Farm Credit implemented and strategies and employed loan structures on the Debtors' credits that perpetuated and enhanced Farm Credit's control over the Debtors' finances and operations.

9. The proceeds of milk sales to the United Dairymen of Arizona, which make up the vast majority of the Debtors' income, are directed to a lock-box account controlled by Farm Credit. With the milk income going directly to Farm Credit, Farm Credit arbitrarily determined when and how much of the proceeds would go to the Debtors for operations.

## IV. FARM CREDIT CANNOT CONTINUE TO CONTROL PROPERTY OF THE ESTATE

10. With the vast majority of the Debtors' income directed to Farm Credit, Farm Credit exercised substantial control over the Debtors.

11. Farm Credit would force the Debtors to short the funding of operations in order to service Farm Credit's loans - some of which were in the name of the Debtors, some of which were loans made to other related and unrelated borrowers.

12. Farm Credit prepared and created all financial statements for the Debtors, including personal financial statements for Daniel and Elaine Nowlin, and used these financial statements to determine when and to whom loans would be made.

3

13.     Farm Credit determined when to liquidate assets including the liquidation of 7 Circles Ranch, a ranch leased by DNF and owned by Daniel Nowlin's mother, Linda Johnson.

14.     Farm Credit also forced an entity owned by Daniel Nowlin; Linda Johnson; his brother, Dennis Nowlin; and John White, known as Keltic Pride Dairy Farm, to liquidate its dairy cows at a forced sale price prior to the end of fiscal year 2013, even though Keltic Pride had a higher price if the sale occurred in January of 2014.

15.     Farm Credit routinely threatened to default the "whole complex" of loans if payments of interest or principal were not made in time to avoid review of the loan by regulators charged with review of Farm Credit's loan portfolio.

16.     Farm Credit used funds from the Debtors' farm and dairy operations, interchangeably directing money and proceeds of loans from either to pay down the loans or to pay the operational costs of the other or third parties.

17.     Farm Credit failed to disclose conflicts of interest to the Debtors.

18.     Farm Credit engaged in self-dealing with the Debtors' pre-petition assets.

19.     Farm Credit's movement of funds among different borrowers and their accounts resulted in substantial disruption of business operations, using funds which should have been directed to payroll withholding and other taxes to make interest payments. The Debtors' loan balances expanded from approximately $11,100,000 in 2011 to the Farm Credit asserted amount of roughly $19,000,000 in 2014.

20.     Farm Credit controlled the Debtors for Farm Credit's benefit by expanding lines of credit so as to keep payments current, require guaranties from additional individuals under false premises, making loans to relatives and friends of the principals without appropriate disclosure or underwriting, and unilaterally making payments from existing lines of credit. Farm Credit determined which collateral would be sold and when, and sweep

4

the proceeds or the Debtors' operations to service and/or payoff credits without notice to Borrowers or Guarantors.

21.     As milk prices continued to rise and the Debtors' production remained consistent, Farm Credit decided to take more money for servicing its loans than it had in the recent past. Additionally, the funds would be taken earlier in the month, and the Debtors were provided funds only upon the production of a receipt. In many instances, the Debtors never received the funds, but money was transferred to a payee directly from Farm Credit.

22.     In many instances the payee was a borrower-customer of Farm Credit.

23.     At Farm Credit's discretion, certain invoices would not be paid at all or Farm Credit would pay only a portion of the invoice. However, Farm Credit would determine what it believed to be an appropriate payment to itself.

24.     Meanwhile, in recent months, Farm Credit applied $140,000 a month to pay itself on its outstanding under-secured loans.

## V.     THE USE OF CASH COLLATERAL AND ADEQUATE PROTECTION

25.     The Debtors require the use of all cash generated from its operations to continue operation of their businesses, including the protection, management, and maintenance of estate assets.

26.     The Debtors' businesses generate cash proceeds through the sale of milk produced on the dairy farms and crops harvested.

27.     While Farm Credit was in control of the Debtors' assets, funds from the dairy operations and the farm operations were used interchangeably and the Debtors have been unable to keep track of debts owed between them. Post-Petition, the consistent income from dairy operations and the seasonal income from the farming operations will be needed to support both operations. The Debtors have bolstered the services of this controller with the retention of Keegan, Linscott & Kenon, CPA's to keep track of the debts owed between D&E Dairy Farms and Daniel Nowlin Farms Partnership.

5

28.     Farm Credit's cash collateral includes the proceeds for the sale of crops currently in the ground as of the Petition Date. However, the proceeds for any crops planted after the Petition Date are not the collateral of Farm Credit. 11 U.S.C. §552.

29.     All proceeds from the sale of milk are currently deposited with Farm Credit in a lock-box arrangement. Farm Credit then determines the funds that it will off-set and then makes or directs the payment of operating expenses.

30.     Farm Credit has abused this power to its benefit and to the detriment of the Debtors, the principals of the Debtors, the principals' extended family members, and the Debtors' remaining creditors.

31.     This Court should terminate the Farm Credit's lock-box on these proceeds.

32.     In recent months, Farm Credit has taken payments of not less than $140,000 per month to pay its pre-petition under-secured debt, thereby leaving insufficient funds for payment of payroll, withholding tax, ad valorem taxes on land and personal property and for payment of operating expenses.

## VI.     APPROPRIATE ADEQUATE PROTECTION FOR FARM CREDIT

33.     The Debtors will provide adequate protection for control over the milk proceeds and crop income by requesting the Court appoint a neutral third-party to control the disbursement of these funds.

34.     Farm Credit is not protected by an equity cushion. However, the Debtors will provide a replacement lien on the Debtors' collateral including: the Debtors' real estate, current liquid assets in which Farm Credit has a perfected security interest in, the Debtors' livestock, Debtors' equipment, and the Debtors' crops that are currently in the ground (collectively the "Collateral"). Farm Credit will receive a replacement lien of the same priority validity and perfected status as existed pre-petition.

35.     Based upon the experience of Daniel Nowlin, the value of the farming and dairy operations will remain constant or increase post-petition as the demand for milk and

6

crops are projected to remain as historically high levels post-petition. While pricing varies weekly, the value of the farms and dairies, their crops and milk should remain relatively constant or increase in the mediate future, within the range of market fluxuations as judged over the long term. The continued operations of the farms and dairies as going-concerns will adequately protect the disputed interests of Farm Credit in the property of the Estates.

36. Farm Credit will not receive a post-petition lien on crops planted subsequent to the Petition Date.

37. Farm Credit will not receive a post-petition lien on milk produced subsequent to the Petition Date.

38. On May 14, 2014, Farm Credit proposed a reduction of the interest rate on its loans with the Debtors to 3.0%, and then failed to implement such a rate.

39. The current value of the Debtors' pre-petition property collateralizing the approximately $19,000,000 claim of Farm Credit is:

      a. The dairy farms in Stanfield and Casa Grande, Arizona are valued at $4,000,000 as of the Petition Date, the values have been corroborated by appraisals conducted in-house by Farm Credit within the last 60 days;

      b. Daniel Nowlin Farms owns 318 acres of farmland in Willcox, Arizona collateralizing a Farm Credit lien of $700,000 as of the Petition Date.

      c. The Debtors own approximately $350,000 of equipment used in the dairy operations.

      d. The Debtors own approximately $200,000 of equipment used in the farming operations.

      e. The proceeds of pre-petition milk produced by the Debtors' cows, estimated to be $350,000 for the previous two weeks. Farm Credit will continue to have a lien on the first $350,000 of the Debtors' cash.

7

f. The Debtors currently have only alfalfa planted in the ground. This crop is valued at $300,000. The collateral of Farm Credit does not include crops that are planted after the Petition Date.

g. The Debtors own approximately 1,850 dairy cows valued at $2,775,000 or $1,500 a head. The collateral of Farm Credit does not include the calves or monies received from the sale of calves since the funds were advanced.

40. The total value of the Farm Credit's collateral package is roughly $9,000,000. The Debtors propose to provide replacement liens per Section 552(a) and make payments of $5,500 per month, representing 1% of the current values of the farm and dairy equipment being depreciated by on-going use. The Debtors will also grant Farm Credit a replacement lien in the same collateral and the same priority as existed pre-petition subject to future proposals of adequate protection or replacement liens. The addition of a third-party fidcuiary to make sure that funds are paid to Farm Credit and that its other cash collateral is used for the operations of the Debtors to protect the collateral of Farm Credit is sufficient to adequately protect Farm Credit as an undersecured creditor.

## VII.  PROJECTED BUDGET

41. The Debtors must utilize all cash generated from operations to continue to conduct ordinary business operations. By continuing to operate their businesses, the Debtors will preserve and enhance the value of the Debtors' assets and can propose a successful reorganization. The Debtors' budget, which is attached as Exhibit A, sets forth the anticipated monthly revenue and anticipated ordinary and necessary expenses to maintain the business operations of the Debtors. This includes the cost of inventory, labor, payroll, and sales taxes, management, insurance, utilities, and supplies.

42.     The Debtors have created this budget with the help of Keegan, Linscott & Kennon. The Declaration of Chris Linscott is attached as Exhibit B, in support of this Motion.

43.     The Debtors have a past-due insurance payment due as of the Petition Date and request authority from the court to use cash collateral to pay for the past-due insurance payment. Additionally, the Debtors do not have any past-due payments for utilities due as of the Petition Date, but request authority from the Court to pay regularly delivered utility payments or the debts incurred by employees to pay past-due utility payments. These payments are necessary to continue the operations of the Debtors' businesses.

44.     It is currently planting season for oats. The budget for the farms reflects an increased expense for labor, seed, fertilizer and other planting expenses that will be incurred post-petition. The Debtors will need to use the proceeds of the dairy to pay for these expenses.

45.     The Debtors under the supervision and with the permission of the Disbursing Agent will track the farming expenses paid by the dairies. These expenses will be paid or reconciled when the crops are harvested and sold or delivered to the dairies for feed. All of these transactions will be reflected on the monthly operating reports of the Debtors.

## VIII.  THE LAW

46.     The Bankruptcy Code authorizes a debtor in possession to utilize another entity's cash collateral with authorization from the bankruptcy court, so long as the other entity's interest in the cash collateral is adequately protected. In this regard, the Bankruptcy Code provides at 11 U.S.C. §363 as follows:

> (c)(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –
>
> (A)     each entity that has an interest in such cash collateral consents; or
>
> (B)     the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

9

(c)(3) Any hearing under paragraph (2)(b) of this subsection may be a preliminary hearing or may be consolidated with a hearing under subsection (e) of this section, but shall be scheduled in accordance with the needs of the debtor.   If the hearing under Paragraph (2)(B) of this subsection is a preliminary hearing, the court may authorize such use, sale, or lease only if there is a reasonable likelihood the trustee will prevail at the final hearing under subsection (e) of this section. The court shall act promptly on any request for authorization under paragraph (2)(B) of this subsection.

***

(e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest...

47.     Adequate protection is defined in § 361 of the Bankruptcy Code, which provides:

When adequate protection is required under § 362, 363 or 364 of this title, of an interest of an entity and property, such adequate protection may be provided by –

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under § 362 of this title, use, sale, or lease under § 363 of this title, or any grant of a lien under § 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under § 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

48.     The Postpetition effect of a security interst is defined in §552 of the Bankruptcy Code, which provides:

10

> (a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.
>
> (b) (1) if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, *except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise*. (Emphasis added)

## IX. <u>ARGUMENT</u>

49. To successfully reorganize, the Debtors must be able to operate their businesses and generate proceeds to pay ordinary and necessary expenses. Without authority to use operating cash, including claimed cash collateral, the Debtors will not be able to (1) pay ordinary and necessary operating expenses including the payment of wages to their employees; (2) purchase the feed and services necessary to operate their businesses and protect the Farm Credit's livestock collateral; and (3) propose a successful plan of reorganization. The Debtors' source of income is the revenue from operations. Without authority to use Farm Credit's claimed cash collateral, the Debtors' business operations will cease.

50. The whole purpose in providing "adequate protection" is to ensure the creditor receives the value for which the creditor bargained pre-bankruptcy. *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987). "Adequate protection" is a concept which is decided flexibly on a case-by-case basis. *In re Martin*, 761 F.2d 472 (8th Cir., 1985); *In re Monroe Park*, 17 B.R. 934 (D.C. Delaware 1982). Since "value" is the lynchpin of adequate protection and since value is a function of many factual variables, it follows that adequate protection is a question of fact. *In re Martin*, 761 F.2d at 472; *In re O'Connor*, 808 F.2d at 1397. Thus, the protection afforded a creditor, whose cash collateral is permitted by the

Bankruptcy Court to be used by a debtor in possession, is whatever condition is deemed necessary to provide adequate protection of the creditor's interest. *In re Quality Beverage Co., Inc*., 181 B.R. 887, 8 96 (Bankr. S.D. Tex, 1995); *In re J.K.J. Chevrolet, Inc*., 190 B.R. 542, 545 (Bankr. E.D. Virginia 1995).

51.　　"As a general rule, post-petition revenue is not cash collateral." *In re Premier Golf Properties, LP*, 477 B.R. 767, 771 (9th Cir. BAP 2012). "The purpose of §552(a) is 'to allow a debtor to gather into the estate as much money as possible to satisfy the claims of all creditors.'" *Id*. quoting *In re Bering Trader, Inc.*, 944 F.2d 500, 502 (9th Cir. 1991).

52.　　"Postpetition proceeds, products, offspring, or profits are subject to an after-acquired property clause only if they derive from pre-petition collateral." Id. at 775. "Section 552(b) is intended to cover after-acquired property that is directly attributable to prepetition collateral, *without addition of estate resources*." *Id*. at 776 quoting Alan N. Resnick & Henry J. Somme reds., COLLIER ON BANKRUPTCY, ¶ 552.02[2] (16th ed. 2012); also citing *In re Northview Corp.*, 130 B.R. 543, 548 (9th Cir. BAP 1991) (proceeds, profits and rents are the result of collateral's conversion into new forms without the aid of new services or assets.)

53.　　"Milk produced post-petition is not intended to be covered by the §552(b) exception." *In re Vanas*, 50 B.R. 988, 997 (E.D. Mich. Bankr. 1985); citing *In re Lawrence*, 41 B.R. 36, 37 (D. Minn. Bank. 1984) ("There is no question in the Court's mind that milk produced post-petition or the proceeds of post-petition milk production are not subject to Section 552(b) exception.").

54.　　Calves are not the proceeds of cattle giving birth to them; and therefore, a lien over proceeds does not extend to calves. A UCC-1 must state that the lien extends to "increase" or "offspring." *Iowa Citizens Sav. Bank v. Miller*, 515 NW 2d 7 (Iowa 1994); *Fairview State Bank v. Edwards*, 739 P.2d 994, 997 (Okla. 1987); *In re Hollie*, 42 B.R. 111, 119 (Bankr. M.D. Ga. 1984).

55.     Farm Credit has a pre-petition security interest in certain of the Debtors' cows. However, the milk proceeds created by those cows, also requires the Debtors' labor, feed costs, and transportation costs. It is not the Debtors that sell the milk, but UDA. UDA analyzes the milk for quality control issues and then market and sells the milk to create proceeds. Without the contribution of these additional resources of the estates, there are no milk proceeds.

56.     The account receivable by UDA is not simply the product of the cows, but of a combination of the services and labor of UDA and other Estate resources. Therefore, the post-petition milk proceeds are not covered by §552(b).

57.     The Debtors propose to provide adequate protection by: (1) making monthly payments on the value of the depreciating equipment that is collateral of Farm Credit; (2) providing a replacement lien on the livestock existing on the day of the filing (not including offspring born after the recording of the security documents on the cows or the proceeds therefrom); and (3) appointing a third party with the authority to pay Farm Credit adequate protection payments from proceeds and to ensure funds are used in the operation of the dairies and farms. This level of adequate protection allows the Court to permit the Debtors' use of cash collateral in accordance with the requirements of the Bankruptcy Code §§361 and 363.

X.     **REPLACING A LOCK-BOX WITH A DISBURSING AGENT IS WITHIN THIS COURT'S DISCRETION**

58.     There is no question that the proceeds from the sale of milk produced at the Debtors' dairies are property of the estate pursuant to 11 U.S.C. §541.

59.     Farm Credit has refused to allow the Debtors discretion to manage their income and operations. The Debtors do not believe that it is appropriate for Farm Credit to operate their businesses and assert that Farm Credit has abused its control over the Debtors' income. See attached Omnibus Declaration and exhibits thereto.

13

60.     The Debtors propose that a third-party fiduciary be placed in control of the milk proceeds and the Disbursing Agent make the required payments sufficient to pay for the potential depreciation of Farm Credit's collateral. This is sufficient to adequately protect Farm Credit.

61.     Pursuant to 11 U.S.C. §105, this Court has the ability to appoint a neutral third party as a disbursing agent in its discretion. *See e.g. In re AOV Industries,* 798 F.2d 491 (D.C. Cir 1986).

62.     Fred Boice has acted as a bankruptcy fiduciary on multiple occasions. (See attached Draft Declaration[1] of Mr. Boice and exhibit thereto). His integrity and reputation is beyond reproach. He has been trained and educated as a rancher and understands the agricultural business. The Debtors propose that Mr. Boice be employed as a neutral party to insure that appropriate monthly payments are made to Farm Credit and that the remaining funds are spent on operation of the dairies and farms and protecting the Farm Credit's collateral.

63.     Mr. Boice will be authorized as provided in the budgets attached or as needed to allow payments of ordinary and customary expenses for dairies and farming operations.

64.     Mr. Boice, the Debtors, and the proposed Financial Advisor to the Estates will provide monthly financial reporting to Farm Credit.

65.     The declaration of Fred Boice demonstrating his qualifications to serve as a disbursing agent and his disinterestedness in the Debtors' Estates.

66.     The Debtors propose that Mr. Boice perform the limited role of receiving the farm and milk proceeds from UDA, distributing the adequate protection payments to Farm

---

[1] Mr. Boice was unable to execute his declaration at the time the Petition was filed, he was consulted in the creation of the Draft Declaration and it anticipated that he will execute it in substantially the same form on or before any first day motion hearings.

Credit disbursing the remaining funds to the Debtors, and reviewing the Debtors'
expenditures to ensure they are used in the operation of the Debtors' businesses.

## XI.   **RELIEF REQUESTED**

The Debtors respectfully request that this Court set an emergency hearing and grant
the following relief:

1)   Authorize the Debtors' use of the Farm Credit's claimed cash collateral; and
for the entry of a final order authorizing the Debtors' use of cash collateral on
an interim basis and for the payment of ordinary and necessary expenses;

2)   Appoint Fred Boice as disbursing agent;

3)   An interim determination that Farm Credit is adequately protected; and

4)   Set a final hearing on the Debtors' use of claimed cash collateral and on the
determination that Farm Credit is adequately protected; and for the entry of a
final order.

DATED:  October 24, 2014         MESCH, CLARK & ROTHSCHILD, P.C.


By  s/Michael McGrath, #6019
       Michael McGrath
       Isaac D. Rothschild
       Proposed Attorneys for Debtor

21K3043

# Exhibit A

# D & E Dairy Farms, LLC & Daniel Nowlin Farms Ptsp.
## Consolidated
## Draft of Preliminary Budget
### November 2014 & December 2014

| | | | |
|---|---:|---:|---:|
| **Ordinary Income/Expense** | | | |
| **Revenues** | | | |
| **Livestock Sales** | | | |
| Calves | 6,218.00 | 11,055.00 | 17,273.00 |
| Bull/Cow Sales | 92,400.00 | 92,400.00 | 184,800.00 |
| Replacement Purchases | -132,000.00 | -132,000.00 | -264,000.00 |
| **Total Livestock Sales** | -33,382.00 | -28,545.00 | -61,927.00 |
| **Milk Sales** | | | |
| UDA - Milk Sales | 925,185.47 | 901,173.39 | 1,826,358.86 |
| Caballero Dairy | 24,794.00 | 23,993.97 | 48,787.97 |
| rBST Free Premium | 14,701.90 | 15,396.88 | 30,098.78 |
| Protein Program Value | 2,799.70 | 4,183.92 | 6,983.62 |
| Quality Program Premium | 2,248.20 | 4,183.92 | 6,432.12 |
| **Total Milk Sales** | 969,729.27 | 948,932.08 | 1,918,661.35 |
| **Industry Assessments** | | | |
| CWT Program | 1,569.52 | 1,673.57 | 3,243.09 |
| rBST Assessment | 7,398.50 | 7,888.38 | 15,286.88 |
| Protein Value Assessment | 2,140.38 | 2,779.56 | 4,919.94 |
| Pool Assessment | 4,564.49 | 4,766.35 | 9,330.84 |
| Quality Check-Off | 3,139.04 | 3,347.13 | 6,486.17 |
| Hauling | 24,182.54 | 25,652.14 | 49,834.68 |
| Marketing | 3,923.80 | 4,183.92 | 8,107.72 |
| Ad. Prom. | 5,885.70 | 6,275.88 | 12,161.58 |
| Industry Assessments - Other | 1,000.00 | 1,241.20 | 2,241.20 |
| **Total Industry Assessments** | 53,803.97 | 57,808.13 | 111,612.10 |
| **Milk Sales Net of Assessments** | 915,925.30 | 891,123.95 | 1,807,049.25 |
| **Customer Advances on Leases** | 0.00 | 400,000.00 | 400,000.00 |
| **Customer Advances on Crops** | 35,000.00 | 35,000.00 | 70,000.00 |
| **Farm Product Sales** | 0.00 | 112,500.00 | 112,500.00 |
| **Total Revenues** | 917,543.30 | 1,410,078.95 | 2,327,622.25 |
| **Cost of Goods Sold** | | | |
| Water | 26,000.00 | 26,000.00 | 52,000.00 |
| Seed Costs | 64,000.00 | 64,000.00 | 128,000.00 |
| Purchased Feed | 160,000.00 | 160,000.00 | 320,000.00 |
| Forage | 180,000.00 | 180,000.00 | 360,000.00 |
| **Total Cost of Goods Sold** | 430,000.00 | 430,000.00 | 860,000.00 |
| | | | |
| **Gross Profit** | 487,543.30 | 980,078.95 | 1,467,622.25 |

# D & E Dairy Farms, LLC & Daniel Nowlin Farms Ptsp.
## Consolidated
## Draft of Preliminary Budget
### November 2014 & December 2014

**Expense**

| | | | |
|---|---|---|---|
| **Payroll Expenses** | | | |
| Gross Salary & Wages | 114,997.61 | 110,207.80 | 225,205.41 |
| Social Security | 7,134.87 | 7,075.37 | 14,210.24 |
| Medicare | 1,962.81 | 1,948.88 | 3,911.69 |
| FUTA | 311.83 | 466.60 | 778.44 |
| AZ Job Train. | 53.10 | 73.52 | 126.62 |
| SUI | 1,833.02 | 2,537.02 | 4,370.05 |
| **Total Payroll Expenses** | 126,293.25 | 122,309.20 | 248,602.45 |
| **Lease Expense** | | | |
| Employee Housing | 1,100.00 | 1,100.00 | 2,200.00 |
| Equipment | 6,200.00 | 6,200.00 | 12,400.00 |
| Land | 0.00 | 480,000.00 | 480,000.00 |
| **Total Lease Expense** | 7,300.00 | 487,300.00 | 494,600.00 |
| | | | |
| Chemicals & Fertilizers | 24,000.00 | 24,000.00 | 48,000.00 |
| Fuel and Oil | 15,193.25 | 46,184.85 | 61,378.10 |
| Supplies | 2,200.00 | 2,200.00 | 4,400.00 |
| Maintenance & Repairs | 21,634.82 | 57,566.05 | 79,200.87 |
| Equipment Rental | 18,829.31 | 9,609.97 | 28,439.28 |
| Telephone | 1,500.00 | 1,500.00 | 3,000.00 |
| Utilities | 25,025.04 | 24,122.05 | 49,147.09 |
| Farm Insurance | 5,000.00 | 5,000.00 | 10,000.00 |
| Health Insurance | 4,300.00 | 4,300.00 | 8,600.00 |
| Workman's Comp | 7,466.50 | 7,466.50 | 14,933.00 |
| Employee Benefits | 13,559.30 | 4,902.97 | 18,462.27 |
| H2A | 5,500.00 | 5,500.00 | 11,000.00 |
| Corral Cleaning | 1,570.50 | 1,570.50 | 3,141.00 |
| Legal & Accounting | 3,333.32 | 3,333.32 | 6,666.64 |
| Veterinary, Breeding, Medicine | 1,464.00 | 2,914.00 | 4,378.00 |
| Testing & Trimming | 1,635.70 | 0.00 | 1,635.70 |
| Hauling | 3,430.00 | 3,659.50 | 7,089.50 |
| **Total Expense** | 289,234.99 | 813,438.91 | 1,102,673.90 |
| | | | |
| **Net Ordinary Income** | 198,308.31 | 166,640.04 | 364,948.35 |
| **Other Expenditures** | | | |
| Capital Expenditures | 5,000.00 | 5,000.00 | 10,000.00 |
| **Total Other Expenditures** | 5,000.00 | 5,000.00 | 10,000.00 |
| **Net Income** | 193,308.31 | 161,640.04 | 354,948.35 |

### Daniel Nowlin Farms Ptsp
# Draft of Preliminary Budget
#### November 2014 & December 2014

| | Nov 14 | Dec 14 | TOTAL |
|---|---|---|---|
| **Ordinary Income/Expense** | | | |
|   **Revenues** | | | |
|     **Customer Advances on Leases** | 0.00 | 400,000.00 | 400,000.00 |
|     **Customer Advances on Crops** | 35,000.00 | 35,000.00 | 70,000.00 |
|     **Product Sales** | 0.00 | 112,500.00 | 112,500.00 |
|   **Total Revenues** | 35,000.00 | 547,500.00 | 582,500.00 |
| | | | |
|   **Cost of Goods Sold** | | | |
|     **Water** | 26,000.00 | 26,000.00 | 52,000.00 |
|     **Seed Costs** | 64,000.00 | 64,000.00 | 128,000.00 |
|   **Total COGS** | 90,000.00 | 90,000.00 | 180,000.00 |
| | | | |
| **Gross Profit** | -55,000.00 | 457,500.00 | 402,500.00 |
| | | | |
|   **Expense** | | | |
|     **Payroll** | | | |
|       **Gross Wages** | | | |
|         **Hourly Wages** | 28,618.00 | 28,618.00 | 57,236.00 |
|         **Salary** | 28,186.00 | 28,186.00 | 56,372.00 |
|       **Total Gross Wages** | 56,804.00 | 56,804.00 | 113,608.00 |
|       **Payroll Taxes** | | | |
|         **Social Security** | 3,521.85 | 3,521.85 | 7,043.70 |
|         **Medicare** | 823.66 | 823.66 | 1,647.32 |
|         **Federal Unemployment** | 200.06 | 200.06 | 400.13 |
|         **AZ Job Train.** | 34.48 | 34.48 | 68.96 |
|         **Arizona Unemployment** | 1,190.38 | 1,190.38 | 2,380.77 |
|       **Total Payroll Taxes** | 5,770.43 | 5,770.43 | 11,540.87 |
|     **Total Payroll** | 62,574.43 | 62,574.43 | 125,148.87 |
| | | | |
|     **Chemicals & Fertilizers** | 24,000.00 | 24,000.00 | 48,000.00 |
|     **Fuel** | 12,000.00 | 12,000.00 | 24,000.00 |
|     **Hauling** | 1,200.00 | 1,200.00 | 2,400.00 |
|     **Supplies** | 1,000.00 | 1,000.00 | 2,000.00 |
|     **Maintenance & Repair** | 8,000.00 | 8,000.00 | 16,000.00 |
|     **Equipment Rental** | 3,000.00 | 3,000.00 | 6,000.00 |
|     **Telephone** | 1,500.00 | 1,500.00 | 3,000.00 |
|     **Utilities** | 3,500.00 | 3,500.00 | 7,000.00 |

Daniel Nowlin Farms Ptsp
# Draft of Preliminary Budget
November 2014 & December 2014

|  | Nov 14 | Dec 14 | TOTAL |
|---|---|---|---|
| **Lease Expense** |  |  |  |
| Employee Housing | 1,100.00 | 1,100.00 | 2,200.00 |
| Equipment | 6,200.00 | 6,200.00 | 12,400.00 |
| Land | 0.00 | 480,000.00 | 480,000.00 |
| **Total Lease Expense** | 7,300.00 | 487,300.00 | 494,600.00 |
| Farm Insurance | 5,000.00 | 5,000.00 | 10,000.00 |
| Health Insurance | 4,300.00 | 4,300.00 | 8,600.00 |
| H2A | 5,500.00 | 5,500.00 | 11,000.00 |
| Work Comp Ins | 2,491.00 | 2,491.00 | 4,982.00 |
| **Total Expense** | 141,365.43 | 621,365.43 | 762,730.87 |
| **Net Ordinary Income** | -196,365.43 | -163,865.43 | -360,230.87 |

Case 4:14-bk-16069-BMW   Doc 6   Filed 10/24/14   Entered 10/24/14 16:49:25   Desc
Main Document    Page 20 of 36

# Exhibit B

MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: mmcgrath@mcrazlaw.com
        irothschild@mcrazlaw.com

By:    Michael McGrath, # 6019
       Isaac D. Rothschild, # 25726
       70066-2/mbt

Proposed Attorneys for Debtors

### UNITED STATES BANKRUPTCY COURT

### DISTRICT OF ARIZONA

| In re: | Chapter 11 Proceedings |
|---|---|
| D&E DAIRY FARMS, LLC, | No. 4:14-bk-16069 |
| Debtor. | |
| In re: | No. 4:14-bk-16072 |
| DANIEL NOWLIN FARMS PARTNERSHIP, | |
| Debtor. | |
| In re: | No. 4:14-bk-16073 |
| DANIEL NOWLIN AND ELAINE NOWLIN, | |
| Debtors. | |

### DECLARATION OF CHRISTOPHER G. LINSCOTT IN SUPPORT OF DEBTORS' MOTION TO DETERMINE ADEQUATE PROTECTION AND APPOINT A DISBURSING AGENT

In support of the *Application for Approval of Employment of Accountants Keegan, Linscott & Kenon, P.C. as Bankruptcy and Financial Advisors* filed concurrently with this Declaration, I declare, pursuant to 28 U.S.C. §1746, under penalty of perjury that :

1.      I am an officer of the accounting firm of Keegan, Linscott & Kenon, P.C. which maintains an office at 33 North Stone Avenue, Tucson, Arizona 85701. I am a Certified Public Accountant duly licensed in the State of Arizona.

2.      Keegan, Linscott & Kenon, P.C. has been asked to serve as accountants for Daniel Nowlin Farms, LLC, ("DNF"), D&E Dairy Farms, LLC ("D&E"), and Daniel Nowlin and Elaine Nowlin ("Nowlin") (collectively, the "Debtors").

3.      Keegan, Linscott & Kenon, P.C. ("KLK") has previously worked as accountants for the Debtors providing financial advice.

4.      KLK created the projections attached to the Debtors' Motion to Determine Adequate Projection.

5.      These projections are created from historical data that we could find from the Debtors.

6.      Although KLK was retained by the Debtors in early 2014, we had to stop working because the Debtors did not have funds to pay our services.

7.      Although KLK met with Farm Credit on numerous occasions and spent substantial time at the Debtors' dairy operations, the Debtors did not receive sufficient funds from the proceeds of the milk produced to pay for operations, taxes, and KLK's services.

8.      It was not until the Debtors received proceeds from a source other than the sale of milk that they were able to compensate us for the work we have done in the last month.

9.      The Debtors were not provided sufficient funds from the proceeds of the milk produced to pay for payroll and tax obligations once Farm Credit applied $140,000 of the proceeds to service its debt.

1        10.    The financials that we have seen created by Steven Reiley (Farm Credit Loan

2    Officer) for the Debtors do not appear to be accurate.

3        11.    It is our understanding that Farm Credit created personal financial statements

4    for Daniel and Elaine Nowlin, we have not seen their personal financial statements.

5        12.    We are in the process of creating schedules for Daniel and Elaine Nowlin in

6    lieu of personal financial statements.

7

8    Dated: October _24_, 2014.

9

10

               /s/ Chris Linscott

11                 CHRISTOPHER G. LINSCOTT

12

13   COPY emailed October ____, 2014 to:

14   OFFICE OF THE U.S. TRUSTEE
     230 N. First Avenue, Suite 204
15   Phoenix, AZ 85003
16   ustpregion14.px.ecf@usdoj.gov

17   21N0798¶

18

19

20

21

22

23

24

25

26

# Exhibit C

MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone:   (520) 624-8886
Fax:     (520) 798-1037
Email: mmcgrath@mcrazlaw.com
        irothschild@mcrazlaw.com

By:    Michael McGrath, # 6019
       Isaac D. Rothschild, # 25726
       70066-2/mbt

Proposed Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>D&E DAIRY FARMS, LLC,<br><br>                    Debtor. | Chapter 11 Proceedings<br><br>No. 4:14-bk-16069 |
| In re:<br><br>DANIEL NOWLIN FARMS<br>PARTNERSHIP,<br><br>                    Debtor. | No. 4:14-bk-16072 |
| In re:<br><br>DANIEL NOWLIN AND ELAINE<br>NOWLIN,<br><br>                    Debtors. | No. 4:14-bk-16073 |

**DECLARATION OF FRED BOICE IN SUPPORT OF DEBTORS' MOTION TO DETERMINE ADEQUATE PROTECTION AND APPOINT A DISBURSING AGENT**

I, Fred Boice, declare, pursuant to 28 U.S.C. §1746, under penalty of perjury that everything in this declaration is accurate and within my knowledge and if called to testify I would state the same. I have attached to this Declaration, as Exhibit A, my current Curriculum Vitae. The following includes certain highlights from Curriculum Vitae and other facts relevant to the Debtors' Motion to Determine Adequate Protection and Appoint a Disbursing Agent.

## I.   <u>BACKGROUND IN AGRICULTURE</u>

1.    I grew-up in the cow-calf ranching business until we sold our last ranch in 1978.

2.    I have taken graduate level classes at the University of Arizona in Animal Sciences.

3.    I have been owner or director in the following agricultural businesses:

    a.    Arivaca Ranch Co. – Arivaca, Arizona

    b.    Boice-Bennett Farms - Amado, Arizona

    c.    Willow Creek Ranch - Vernal, Utah

    d.    Western Slope Feeders, Inc. – Grand Junction, Colorado

    e.    Arizona Feeds

4.    In 1972, I was the President of Southern Arizona Cattlemen's Protective Association.

5.    In 1978-79, I was the President of the Arizona Cattlegrowers Association.

6.    From 1977-1980, I was the Director of the National Cattlemen's Association.

7.    In 1980, I was the President of the Cattle Marketing Information Service.

8.    In 1988, I was honored by the University of Arizona's College of Agriculture with their Distinguished Citizen Award.

## II. **EXPERIENCE AS A FIDUCIARY**

9. I have served as a Chapter 11 Trustee in no less than six cases.

10. I served as a Chapter 11 Financial Administrator in The Insurance Group, Inc. bankruptcy case.

11. I have served as a Chapter 12 Trustee is no less than 11 cases including Mud Springs Land & Cattle Co. and Highland Cattle.

12. I have also served as a Chapter 7 Trustee in no less than two cases.

13. I have served as a Liquidating Agent in the Chapter 11 bankruptcy case of Greenough Feedyard & Trucking.

14. I have served as a Bankruptcy Examiner in no less than four cases.

15. I have served as a designated responsible person in a Chapter 11 case.

16. I have served as a Trustee in no less than two cases in Arizona Superior Court and a state court receiver in no less than seven cases.

17. I have served as a receiver in Federal Court in not less than two cases.

18. I am willing and able to serve as an Estate Fiduciary in the Debtors' cases.

## III. **SCOPE OF SERVICE**

19. As a Fiduciary in the Debtors' cases it is my understanding that I will:

   a. Be responsible for collecting certain milk proceeds from the Debtors' dairies;

   b. Disbursing funds required for the normal and customary operation of the Debtors' farming and dairy operations;

   c. Disbursing funds required for adequate protection to Farm Credit, if any is required by the Court;

   d. Disbursing funds to other creditors as directed by Court Order;

   e. Review operational records of the Debtors to ensure that funds are being used for farming and dairy operations;

1          f.        Monthly reports to the Court of my activities; and

2          g.        Review Debtors' monthly reporting to make sure that all funds are

3                  properly accounted for.

4          h.        I stand willing and able to provide all of these functions, some of these

5                  functions or potentially more functions if requested to be the Court.

## IV.    RELATIONSHIP TO THE DEBTORS

7      20.    I have been asked by the Debtors to act as a Disbursing Agent for the Debtors.

8      21.    The Debtors have promised to pay me for services rendered or to be rendered

9 in connection with the case of not more than $4,000 per month to serve as Disbursing

10 Agent.

11     22.    The source of compensation is the Debtors and I have not agreed to share such

12 compensation with anyone.

13     23.    I have not previous word for the Debtors although I have toured the Debtors'

14 dairy operations.

15     24.    I do not have any agreements with any other entity with respect to

16 compensation received pursuant to my role as Disbursing Agent. I do not hold any interest

17 adverse to the Debtors and/or to the bankruptcy estates with respect to the services provided

18 by a Disbursing Agent. I don not have any connection with the creditors or any other party

19 in interest, or their respective attorneys, or any person employed in the office of the United

20 States Trustee, and represents no interest adverse to the Debtors or the bankruptcy estates.

21     25.    No agreement prohibited by 18 U.S.C. §155 has been made.

22    DATED: _____

23

24                            _____

                                 FRED T. BOICE

25

26

COPY emailed October _____, 2014 to:

OFFICE OF THE U.S. TRUSTEE
230 N. First Avenue, Suite 204
Phoenix, AZ 85003
ustpregion14.px.ecf@usdoj.gov

_____
21N1287

# Exhibit A

# FRED T. BOICE

DATE OF BIRTH:        April 8, 1930

PLACE OF BIRTH:       Pasadena, California

EDUCATION:            Tucson Public Schools
                      Tucson High School - graduated 1948
                      Occidental College, Los Angeles, California
                          Bachelor of Arts - Economics 1952
                      Graduate work, Animal Science,
                          University of Arizona - no degree

EXPERIENCE:

    Business:
        Arivaca Ranch Co., Arivaca Arizona
            Stockholder-General Manager          1954-78
        Boice-Bennett Farms, Amado, Arizona
            Partner                              1956-63
        Willow Creek Ranch, Vernal, Utah
            Partner-General Manager              1963-66
        Western Slope Feeders Inc.,
            Grand Junction, Co.
            Stockholder-Vice President           1966-69
        Arizona Feeds                            1967-74
            Director
        Coca-Cola Bottling Company
            of Douglas, Arizona
            Stockholder-President                1968-81
        American Cattle Company, Phoenix, Arizona
            Stockholder-President                1969-74
        Boice-Roberts Company
            Stockholder-President                1980-88
        F-A Investment Company, Tucson, Arizona
            Stockholder-President                1981-83
        Boice Associates Limited Partnership
            General Partner                      1983-91
        Boice Financial Company, Inc.
            Stockholder-President                1983-88
        Boice Financial Company
            Owner                                1989-
        U.S. Bankruptcy Court
            Trustee, Examiner                    1986-98
        U.S. District Court, Arizona
            Receiver                             1990-
        Caseworks Furniture Mfg.                 1984-
            Chairman of the Board
        Executive International, Inc.            1986-88
            Investor-Director
        InfoPlan International, Inc.             1991-92
            Investor-Director

Fred T. Boice
Page Two

Business:
B & W Investments LLC                          1995-99
    Managing Member
Pallet Recyclers                               1997-99
    Managing Member

Directorships:
Trico Electric Cooperative, Inc.               1957-59
Pima Savings & Loan Association                1963-76
Arizona National Livestock Show            various years
Arizona Feeds                                  1967-74
Tucson Airport Authority                       1971-77
    President 1976
Junior Achievement of Tucson                   1972-75
    President 1975
Northern Trust Bank of Arizona                 1980-92
University of Arizona Foundation               1982-09
    President 1985-87
    Emeritus                                   1992
University Medical Center Corporation          2002-10
Human Adventure Center                         1982-87
Cambridge Capital Group                        1983-84
Tucson 30                                      1983-98
    Chairman 1983-84
Tucson Medical Center,
    Board of Trustees                          1984-94
    Chairman 1988-92
    Vice Chairman 1986-87
    Committees, various
HealthPartners of Southern Arizona
    Finance Committee                          1994-97
    TMC HealthCare's Government Relations      1995-02
    Retirement Committee                       1994-02
    Strategic Planning Committee               1994-97
Arizona Town Hall                              1986-90
Community Foundation for Southern Arizona      1997-03
    Director
Tucson Metropolitan Chamber of Commerce
    Director                                   1999-2007
Institute for Children, Youth & Family
    Executive Committee                        1999-2000

Governmental:
Arizona State Parks Board                      1960-66
    Chairman 1964 and 1966
Governor's Committee on Taxation               1968
Arizona Board of Regents                       2002-10
    President                                  2007&2008

Fred T. Boice
Page three -

     Association:
          Southern Arizona Cattlemen's
               Protective Association
               President 1972
          Arizona Cattlegrowers Association
               President 1978-79
          National Cattlemen's Association
               Director 1977-80
               Executive Committee 1980
          Cattle Marketing Information Service
               Executive Committee 1978-81
               President 1980


The University of Arizona, College of Business &
Public Administration
          Distinguished Citizen Award            1985

The University of Arizona, College of Argiculture
          Distinguished Citizen Award            1988

The University of Arizona Foundation
          Honorary Member Board of Directors     1992
          Director Emeritus                      1993

Tucson Airport Authority
          Emeritus                               2000

The University of Arizona Alumni Association
          Law College
          Honorary alumnus                       2008

The University of Arizona
          Honorary Doctorate (Doctor of Science) 2010


Family:
     Wife Ann, five children and fifteen grandchildren.

FRED T. BOICE
U. S. Bankruptcy Appointments


Trustee (Chapter 11)
  * 22 Spokane Limited Partnership      06/16/87-10/14/97
 *** The JNC Companies                  09/24/87-02/21/95
  ** Lake Shore Equipment               01/19/89-07/05/90
  * Shepis Development Corp.            04/06/89-08/12/92
    Isbell Printing                     04/08/92-01/24/96
    The Roman Catholic Church of the    09-20-05
    Diocese of Tucson

Trustee (Chapter 12)
    Earven Ranches                      12/10/86-12/15/88
  * Mud Springs Land & Cattle Co.       01/30/87-04/28/94
    Roland, Flora LaFleche              07/08/87-08/14/91
    Highline Cattle                     06/02/88-09/09/98
    Thomas A. Miller                    08/11/88-12/17/90
    Michael D. Homrighausen             11/22/88-09/17/91
    Daniel A. Wood dba End Ranches      06/05/89-08/01/89
  * D. Allen Jones                      05/02/90-12/06/95
    Robert K. Davis                     01/23/90-03/29/90
    Harriet Diwan                       11/29/90-04/09/97
    Estrella Partnership                12/31/90-01/06/92

Trustee (Chapter 7)
    Goldfield Mines                     12/18/89-04/30/91
    Lake Shore Equipment                07/06/90-11/27/91

Trustee (AZ Superior Court)
    Howard M. Gerson and
    Aileen Gerson-Brewer                04-13-94-08-10-95
        (Pro Tempore Joseph R. McDonald)

Examiner (Chapter 11)
    Tucson Estates Inc. (Golf Course)   11/21/88-01/14/91
    Marina Club Development             02/09/89-08/15/91
  * AIM III Ltd., Limited Partnership   09/28/89-01/27/92
 ** TRC Partnership                     03/10/90-09/26/93

Designated Responsible Person (Chapter 11)
  * Capital Mortgage Brokers            11/16/89-10/27/95

Receiver (AZ Superior Court)
    Capital Mortgage Brokers            06/15/89-11/15/89
    Wray Company                        04/30/90-06/12/90
    Home Lighting Gallery               03/01/90-08/13/90
    Sunhaven of Tucson                  05/24/93-01/31/95
        (Judge William H. Tinney)
    Corporativo Valenzuela Hermanos     08-16-04
        S.A.DE C.V., a foreign
        Corporation

Fred T. Boice
U.S. Bankruptcy Appointments
Page two –


    Receiver (Federal Appointment)
        * TE-One, Inc.           05/14/90-01/14/91
        * Kinney RV Resort     05/14/90-01/14/91

    Special Master (Federal Appointment)
        Tucson Estates, Inc.    04/27/90-01/14/91

    Financial Administrator (Chapter 11)
        * The Insurance Group, Inc.   03/09/93-9/30/98

Other Appointments

    Receiver (Superior Court of Arizona   12/20/96-11/13/97
           Cochise County)
        Shannon Anderson & Jane A. Lee
           v. Gary G. Askew


    Receiver (Superior Court of the State of
        Arizona, Pima County)
    Oasis at Wild Horse Ranch, Inc.    12/09/08-10/01/10


    Interim Trustee (Superior Court of   01/08/03-12/31/03
        Arizona, Pima County)
        Revocable Trust dated
        October 14, 1982, aka Howard
        S. Horne & Associates Trusts
        T-101 and T-102 (aka T-801 and
        T-802)

    Manager and Liquidating Agent    09/01/03-03-21-05
        and Pool Administrator
        Greenough Feedyard & Trucking
        (Chapter 11)

    Appointment of Successor Trustee   12/11/08
        Ula S. Beaudry Family L.P., L.L.P.
        Trustee: Boice Fiduciary Co., L.L.C.


      *1- 15 Million
    ** 16-100 Million
  *** Above 100 Million