MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: mmcgrath@mcrazlaw.com
irothschild@mcrazlaw.com

By: Michael McGrath, # 6019
Isaac D. Rothschild, # 25726
70066-2

Proposed Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>D&E DAIRY FARMS, LLC,<br><br>Debtor. | Chapter 11 Proceedings<br><br>No. 4:14-bk- 16069-BMW |
| In re:<br><br>DANIEL NOWLIN FARMS GENERAL PARTNERSHIP,<br><br>Debtor. | No. 4:14-bk- 16072-BMW |
| In re:<br><br>DANIEL NOWLIN AND ELAINE NOWLIN,<br><br>Debtors. | No. 4:14-bk- 16073-BMW |

**MOTION TO OBTAIN EMERGENCY AND FURTHER POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §364(c) AND 11 U.S.C. §105**

D&E Dairy Farms, LLC ("D&E"), Daniel Nowlin Farms General Partnership

("DNF") and Daniel Nowlin and Elaine Nowlin ("Nowlin") (collectively the "Debtors in possession" or "Debtors"), pursuant to 11 U.S.C. §§361 and 364(c)(2), and Rule 4001, Fed. R. Bankr. P., move this Court for an order (1) authorizing the borrowing of up to $100,000 in post-petition financing from secured creditor Milky Way Dairy, LLC ("Milky Way"), on an emergency basis to pay planting expenses for the oat crop that is now being planted, with such financing to be secured by an assignment of the oat crop to Milky Way; (2) authorizing the further borrowing of up to $400,000 from Milky Way to pay the lease payments due December 15, 2014 on leased farmland used to grow the oat crop, with such financing to be secured by an assignment of the oat crop; and (3) authorizing Debtor D&E to advance post-petition dairy income to Debtor DNF for ongoing working capital needs. The Debtors request preliminary approval of the post-petition financing and for the Court to set further hearings on final approval of the post-petition financing.

This *Motion* is supported by the accompanying Memoranda of Points and Authorities and Exhibits incorporated by this reference.

DATED: October 30, 2014.

MESCH, CLARK & ROTHSCHILD, P.C.


By  s/David J. Hindman, #24707
    Michael McGrath
    David J Hindman
    Isaac D. Rothschild
    Proposed Attorneys for Debtors

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     COMPLIANCE WITH RULE 4001(c) AND LOCAL RULE 4001-4**

The Debtors are in the process of finalizing a post-petition financing agreements with secured creditor Milky Way. The material terms agreed to by the Debtors and Milky Way, subject to final terms acceptable to the Lender, include providing the Debtors with post-petition financing of up to $100,000 to pay for seed, fertilizer, fuel, water, and labor necessary to finish planting DNF's oat crop, and providing financing of up to $400,000 to pay the lease payments for the farm land leased by the Debtor on which most of the oat crop will be grown. Such financing would mature in six months and interest would accrue at 5% per annum. No payments would be required before maturity; however as crops are harvested and sold to Milky Way, the market price of the harvested crop will be credited against any amounts due on the post-petition loans. As security for the post-petition financing, the Debtors will grant Milky Way an assignment of and security interest in DNF's oat crop which is being planted. The lien granted by the Debtors against the oat crop will not cross-collateralize Milky Way's pre-petition claims.

**II.     JURISDICTION AND VENUE**

On October 24, 2014 (the "Petition Date"), each of the Debtors filed a voluntary Petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their businesses as Debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. This Court has jurisdiction to consider this *Motion* pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**III.     THE DEBTORS' FINANCING NEEDS**

Debtor DNF owns a 318 acre farm in Willcox, Arizona and leases five farms in Pinal County to farm another 2,300 acres of farm land. (*See Exhibit A, Declaration of Daniel Nowlin in Support of Motion To Obtain Emergency and Post-Petition Financing Pursuant*

*to 11 U.S.C. §364(c) and 11 U.S.C. §105*, ¶ 5). On its farm land, DNF grows crops that it sells to Debtor D&E and to third parties. Debtor D&E owns and operates dairy farms in Casa Grande, Arizona and in Stanfield, Arizona, and has approximately 1,850 dairy cows. The crops grown by DNF are used to feed D&E's dairy herd. The crops grown by DNF provide a reliable and quality feed source for D&E's dairy herd.

The Debtors and Milky Way have a long-standing, cooperative relationship. (*Exhibit A, ¶8-9*). Milky Way has historically provided dairy cows, feed commodities, and financing for DNF's and D&E's operations. (*Id.*) In the past the Debtors repaid Milky Way by providing feed commodities grown by DNF or cash payments. To secure pre-petition funds advanced to the Debtors, Milky Way holds a pre-petition first-position security interest in, among other things, the agricultural products (seed, silage, fertilizer, crops, and grain) used or grown in DNF's farming operations and D&E's dairy. (*Id.*)

DNF's farming operations require extensive cash outlays to plant and grow crops until harvest, which outlays are then recouped when the crop is harvested and sold. For the current oat crop, DNF expects additional planting expenses for seed, fertilizer, fuel, labor, and water totaling no more than $100,000, and lease payments for the farm land, totaling no more than $400,000. (*Exhibit A, ¶7*). Funds for the planting expenses are needed immediately, while the lease payments are not due until approximately December 15, 2014. At harvest, DNF expects the oat crop to be valued at approximately $900,000. (*Exhibit A, ¶6*).

In the past, DNF has obtained financing from Milky Way or others to cover planting and other expenses, which loans are then repaid by selling part of the harvest directly to the lender or through cash payments after sales to third parties. In addition, historically many of DNF's working capital needs and expenses were paid from the milk proceeds of D&E. (*Exhibit A, ¶10*). D&E's milk proceeds – which are received bi-monthly from United Dairymen of Arizona and therefore are less cyclical than farm revenues – were placed in a

lock-box controlled by Farm Credit. (*Id.*) Farm Credit forced the Debtors to use the milk proceeds to service the loans of D&E, DNF, and others, and to use milk proceeds to cover planting and other farm expenses. (*Id.*) While the milk proceeds were under the control of Farm Credit, separate books and records were not kept for D&E and DNF with respect to the milk proceeds used to cover DNF's expenses, or for the crops grown by DNF used to feed D&E's cows. (*Id.*)

The Debtors need post-petition financing to pay farming expenses including the planting expenses for the oat crop that is now being planted and the lease payments due in December 2014 for the leased farm land. (*Exhibit A, ¶7, 13*).

In addition, pursuant to the pre-petition operating structure established by Farm Credit, DNF will need advances from D&E's milk proceeds to cover ongoing working capital needs, including for labor, water, fertilizer and fuel expenses until crops are harvested. (*Exhibit A, ¶13*). Upon harvest of the oat crop, DNF will be able to repay D&E through the sale to D&E of the oats grown. (*Id.*) Unlike under the system established by Farm Credit, since the petition date the Debtors, through Keegan Linscott & Kenon, have kept separate books for each Debtor and are accounting for all milk proceeds, all feed commodities, and all farming expenses. (*Exhibit A, ¶11-12*).

## IV. THE DIP LOAN PROPOSAL

Milky Way is willing to provide the Debtors post-petition financing of up to $500,000 secured only by an assignment of the oat crop to be grown by DNF. Milky Way will loan the funds at an interest rate of 5%, with the loan maturing in six months. The oat crop now being planted will be harvested within the six month term of the financing agreement. Payments will not be required prior to maturity, except that the market rate for any harvested oats sold to Milky Way shall be offset against the balance due under the financing agreement until paid in full.

The Debtors believe that they are not able to receive more favorable terms than those being offered by Milky Way. (*Exhibit A, ¶14*). Milky Way is offering the financing at market rates, and accepting Milky Way's proposal will help preserve the cooperative relationship with Milky Way that has long provided benefits to the Debtors including access to additional dairy cows and feed commodities. Even if the Debtors could obtain a lower interest rate from another lender, the Debtors believe that preserving the relationship with Milky Way provides benefits to the Debtors ongoing operations and reorganization efforts that more than compensate for a small difference in interest. (*Exhibit A, ¶14*). The Debtors cannot find a debtor in possession lender willing to extend credit to the Debtors on an unsecured basis allowable under § 503(b)(1) of this title as an administrative expense.

The Debtors therefore propose to borrow up to $500,000 from Milky Way outside of the ordinary course of business to assist with farming expenses, upon the material terms discussed above. After consultation with the Debtors' professionals and upper level management it has been determined that Milky Way's proposal is reasonable under the circumstances and appears to be the best available terms available to the Debtor for post-petition financing. (*Exhibit A, ¶14*). Farm Credit has indicated that they will not provide any additional loans to support the DNF or D&E operations. (*Id.*) This proposed post-petition DIP financing is necessary to maintain the Debtors' business relationships with key vendors and suppliers, to meet the Debtors' working capital needs, and to maintain their farming operations and farm capacity.

The Debtors further propose to use D&E's milk proceeds as a source of funds to cover DNF's ongoing working capital needs pursuant to the pattern and practice established by Farm Credit. Through Keegan Linscott & Kenon, the Debtors will keep separate books and account for any milk proceeds advanced to DNF, and also account for DNF's harvested crops supplied as feed to D&E. In this way the Debtors will be able to continue to operate

and meet their working capital needs pursuant to the processes established by Farm Credit, but also account for all funds exchanged as they work toward reorganization plans.

To ensure the Debtors' business operations are not interrupted, and to ensure that these Chapter 11 cases proceed optimally, the Debtors have concluded that obtaining post-petition financing and using milk proceeds to finance DNF's working capital needs is necessary and in the best interest of the Debtors and their estates.

## V. THE LAW AND ARGUMENT

The Bankruptcy Code authorizes a debtor in possession to obtain financing post-petition pursuant to § 364. This section permits the Court, after notice and hearing, to authorize a debtor to obtain credit or the incurring of debt secured by a lien on property of the estate if the debtor is unable to obtain unsecured credit allowable as an administrative expense pursuant to §503(b)(1). In this regard § 364 provides:

> (c) If the trustee is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or incurring of debt –
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien;

The Debtors have been unable to locate financing in exchange for administrative claims. Milky Way's proposal for market-rate financing secured by a lien on growing crops is the best post-petition financing option available to the Debtors, and there is no unsecured financing available for the Debtors' needs. *In re Snowshoe Company*, 789 F.2d 1085, 1088 (4th Cir. 1986) (the trustee contacted other financial institutions in the immediate geographic areas and was unsuccessful in obtaining unsecured credit); *In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (unsuccessful attempt to secure financing from other sources justified senior priority loan under Bankruptcy Code §364); *In re Ames Dept. Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (that the debtors had

contacted four lenders satisfied the requirements of Bankruptcy Code §364 that debtors were unable to obtain comparable financing on an unsecured basis).

In these circumstances, the Bankruptcy Code imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable. *In re Snowshow Company,* 789 F.2d at 1088. There are few lenders likely to be able or willing to extend the necessary credit to the Debtors, it would be unrealistic and unnecessary to require the debtor to conduct an exhaustive search for financing. *See In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).

After appropriate investigation and analysis, including careful and time-consuming deliberations among the Debtors' restructuring counsel and advisors, the Debtors reasonably concluded that Milky Way's proposal was the best alternative available to the Debtors. Accordingly, the Debtors have concluded in their business judgment that the DIP Loan is the most favorable for these estates, and it may provide an expedient resolution to these cases. Consequently, the Debtors' efforts in this regard satisfy the statutory requirements of § 364(c).

The proposed terms of the DIP Loan are reasonable. The proposed terms are market rate and the same terms Milky Way provided to the Debtors on pre-petition financing. The purpose of the DIP Loan is to enable the Debtors to maintain the stability of their operations during these Chapter11 cases. See *In re First South Savings Assoc.,* 820 F.2d 700, 710-15 (5th Cir., 1987); *In re Tenney Village Co.*, 104 B.R. 562, 568-69 (Bankr. D.N.H. 1989). With access to the DIP Loan, which includes immediate access of up to $500,000 pending entry of the Final Order, the Debtors are hopeful that they can maintain the stability of their operations during the remainder of these Chapter 11 cases. The Debtors' ability to achieve their goals depends on continued operations and the generation at the targeted levels of cash flow requiring access to working capital.

As described above, after appropriate investigation and analysis, the Debtors have concluded the DIP Loan is the best alternative available under the circumstances. Bankruptcy courts routinely defer to the Debtors' business judgment on most business decisions, including the decision to borrow money. See *Group of Instituional Investors vs. Chicago Mil. St. & Pac. Ry.,* 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo., 1985) (business judgment should be left to the board room and not to the bankruptcy court); *In re Lifeguard Industries, Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio, 1983). More exacting scrutiny would slow the administration of the Debtors' estate and increase its costs, interfere with the Bankruptcy Code's provisions for private control of administration of the estates, and threaten the Court's ability to control a case impartially. *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assoc.,* 14 B.R. 507, 511-13 (Bankr. D. Utah, 1981) (courts generally will not second guess a debtor's business decision when those decisions involve a business judgment made in good faith, upon a reasonable basis, and within the scope of authority granted under the Bankruptcy Code) *Curlew Valley*, 114 B.R. at 513-14.

The Debtors have exercised sound business judgment seeking advice from their restructuring advisors in determining that the DIP Loan is appropriate, and have satisfied the legal prerequisites to borrow under the DIP Loan. The terms of the DIP Loan are fair and reasonable and are in the best interest of their estates. Accordingly, under the Bankruptcy Code, §364(c), the Debtors should be granted authority to enter into the DIP Loan and to borrow funds from Milky Way on the terms described above. Furthermore, advancing milk proceeds to DNF for working capital needs is fair and reasonable and in the best interests of their estates, where the funds will be used in growing and harvesting the oat crop which in turn will be sold to D&E as feed. Using D&E's milk proceeds in this way provides

assurances of a reliable and quality feed source for the dairy. Accordingly, under §§105 and 364, the Debtors should be granted authority to use the milk proceeds for DNF's working capital needs.

## VI. RELIEF REQUESTED

The Debtors respectfully request this Court:

1) Grant Debtors' request for authority to enter into the DIP Loan on an interim basis;

2) Set subsequent interim hearings, as may be necessary, on the finals terms of the DIP Loan on an interim basis;

3) Set a final hearing on Debtors' *Motion for Authority* to enter into the DIP Loan;

4) Enter a final order authorizing Debtors to enter into the DIP Loan;

5) Grant the D&E authority to advance its milk proceeds to DNF for working capital in DNF's farming operations, pursuant to the pattern and practice established by Farm Credit.

6) For such further relief as the Court deems appropriate.

DATED: October 30, 2014.

                              MESCH, CLARK & ROTHSCHILD, P.C.

                              By s/David J. Hindman, #24704
                                  Michael McGrath
                                  David J. Hindman
                                  Isaac D. Rothschild
                                  Proposed Attorneys for Debtors

21N7847.DOCX

# Exhibit A

MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: mmcgrath@mcrazlaw.com
irothschild@mcrazlaw.com

By: Michael McGrath, # 6019
    Isaac D. Rothschild, # 25726
    70066-2/mbt

Proposed Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| In re: | Chapter 11 Proceedings |
|---|---|
| D&E DAIRY FARMS, LLC, | No. 4:14-bk-16069 |
| Debtor. | |
| In re: | No. 4:14-bk-16072 |
| DANIEL NOWLIN FARMS GENERAL PARTNERSHIP, | |
| Debtor. | |
| In re: | No. 4:14-bk-16073 |
| DANIEL NOWLIN AND ELAINE NOWLIN, | |
| Debtors. | |

**DECLARATION OF DANIEL NOWLIN
IN SUPPORT OF MOTION TO OBTAIN EMERGENCY AND POST-PETITION
FINANCING PURSUANT TO 11 U.S.C. §364(c) AND 11 U.S.C. §105**

I, Daniel Nowlin, declare, pursuant to 28 U.S.C. §1746, under penalty of perjury that:

1. I am President of Daniel Nowlin Farms General Partnership ("**DNF**"). I have 25 years of experience in the farming business and I am responsible for the day-to-day management of DNF.

2. I am a general partner of D&E Dairy Farms, LLC ("**D&E**"). I have 19 years of experience in the dairy business and I am responsible for the day-to-day management of D&E.

3. I am familiar with the respective day-to-day operations, business, and financial affairs of DNF and D&E.

4. The statements set forth below are true to the best of my personal knowledge, and I am competent to testify as to the validity of these statements if called to do so.

5. DNF owns the 318 acre farm in Willcox, Arizona and has a leasehold interest to farm another 2,300 acres of farm land. DNF is in the process of planting an oat crop, which will be used as feed at D&E's dairy cows and sold to other dairies.

6. Once harvested, the oat crop will have a value of approximately $900,000.

7. The cost to complete the planting of the oat crop, including additional seed, fertilizer, water, fuel, and labor, will be no more than $100,000. In addition, lease payments of less than $400,000 on the leased farm land are due on or about December 15, 2014. DNF will also incur various expenses for additional fuel, water, fertilizer, and labor to take the oat crop through harvest.

8. In the past, DNF and D&E worked cooperatively with Milky Way Dairy, LLC, providing each other with feed commodities. In addition, Milky Way provided D&E with dairy cows and lent funds to DNF and D&E on favorable terms.

9. Milky Way has proposed to lend D&E and DNF up to $500,000 to cover planting expenses for the oat crop and lease payments for the farm land, with interest at 5% and secured only by the oat crop to be grown.

10. Additionally, in the past D&E's milk proceeds have been put in a lockbox under the control of Farm Credit. Farm Credit treated D&E and DNF as a single account, and used D&E's milk proceeds to service the loans of not only D&E but also DNF and other borrowers. Furthermore, Farm Credit used the milk proceeds to pay farming expenses of DNF. Farm Credit did not keep separate records for each entity.

11. Keegan Linscott & Kenon was retained in part to separate the accounting for each entity and determine the extent of due-tos and due-froms between the Debtors.

12. Since the petition date, separate books and records have been kept for each Debtor, and proper accounting is being made for the receipt and use of all milk proceeds, farm expenses, and purchases of feed commodities.

13. D&E and DNF cannot, overnight, unwind the operating procedures established by Farm Credit. At least initially it is expected that DNF may need advances from the milk proceeds to cover ongoing working capital needs, which advances can then be repaid by the sale of harvested feed crops to D&E.

14. After consultation with the Debtors' professionals and management, we believe that Milky Way's proposal is reasonable under the circumstances and appears to be the best available terms available to the Debtors for post-petition financing. Farm Credit has indicated that they will not lend additional funds to support the operations of DNF or D&E. We believe that preserving the relationship with Milky Way provides benefits to the Debtors' ongoing operations and reorganization efforts that more than compensate for a small difference in interest.

15. We also believe that continuing to use the milk proceeds to fund working capital needs of DNF is reasonable and appears to be the best available terms available to the Debtors.

//

//

1     DATED: October 30, 2014

3                                           s/Daniel Nowlin
                                             DANIEL NOWLIN

21N9778.DOCX